American Commercial Lines v Water Quality Insurance May it please the court, my name is John Nicoletti and together with Richard Stone represent the appellant, American Commercial Lines and its insurers, excess insurers. Although there are two parts to this appeal, they are interrelated to this extent. The district court did award ACL and its excess insurers a sum in excess of 3.5 million dollars for reimbursement of defense costs. What's important about that decision, it ties in to the to our appeal from the district court's denial of additional reimbursements because of an alleged failure to obtain the consent. How much more were you seeking in defense costs beyond the 3.5? Approximately another 2.8 to 3 million dollars plus interest. And you were paid on phase one how much? $551,000. And so that adds up to roughly 7 million? That is correct. Defense costs on coverage that has a 5 million dollar limit, does that make any sense? Yes it does your honor. When you when you examine the purpose of these policies, they are to provide both defense costs separate and apart from the liability limit? I understand that there is the express language on that and certainly to the extent you were being paid 5 million on liability and then the expenses and costs were more, you would be entitled to that. But you are only entitled to investigation and defense costs with respect to any liabilities covered under coverage A, not any liabilities under coverage A, liabilities covered under coverage A. And the limit of coverage is stated in the insurance contract to be according to the vessel schedule which is here 5 million. So it's difficult for me to understand how once the 5 million limit is reached, expenses or investigation conducted thereafter, investigation and costs occurring before the 5 million is reached, even though it's going to mean paying more than 5 million, I'm fine with. But the investigation and costs after the 5 million is reached, how is that a liability covered under the policy? Well the term liabilities covered under the policy refers to the type of liability. Where does it say that? If you look at the structure of the policy. I am and the part I'm looking at says that liabilities are covered, the limit of liability, this is part 2 article A, the limit of liability is stated on the vessel schedule. So I wouldn't think liability is covered beyond that limit. If you look at the vessel schedule, it limits the liability indemnity limits to coverages A and B. It is silent on coverage C. Any liability under A above 5 million dollars? Yes. Under A? How so? The liabilities covered under A are all types of liabilities which fall upon American commercial lines for its open liabilities. With respect to this one vessel, it's 5 million per vessel, with respect to this casualty, is there any liability covered under A beyond 5 million dollars? There's no payments to be made by the policy. Is there any liability beyond the 5 million for this one vessel? As far as the indemnity limit under this policy, it caps at 5 million dollars. Would you agree that there's some arguable ambiguity here as to what this means? Not at all, and I'll explain why. The way this policy is structured, they structure it under part 1 for liabilities under A, OPA, B, CERCLA, C, defense costs for A and B, A or B, D is for other pollutants other than A and B, E is publicity, and I think F is fines and penalties. If you look at the coverages for D, E, and F, this policy specifically says those coverages will be limited to that amount for both liabilities and cost of defense. Right, and that puts a dollar amount cap on it. There is no dollar amount cap on the costs and insurance. I understand that. What it is limited to is that those costs and those investigative or defense costs have to be limited, and that seems to me to be limited to the 5 million dollar limit. I would agree with you as far as indemnity payments, the policy is clear. It pays only 5 million dollars. I'm talking about costs and defense, and I'll suggest another reason that I'm troubled by this. Your excess coverage policies aren't limited to the liabilities, excess for the liabilities. They are also for defense costs and investigation, but as I understand how you're urging us to construe this contract, there would never be excess costs for defense and investigation. Well, there absolutely would be, Your Honor. How? I may be missing something. It could be outside the scope of coverage A. In other words, these excess policies... They wouldn't be excess, then. They are still excess to other liabilities, such as the P&I liability for personal injury. Had that floated above the P&I tower, those defense costs were a combined single limit to the indemnity limit. The Great American case, I think, is a great illustration. If an underwriter wishes to cap its defense costs where it agrees to pay them outside the indemnity limit, the language which has been incorporated in most policies since 1985 and beyond states that our obligation to pay for defense ends upon payment. You agree this is not a duty to defend? I agree with that. This is duty for reimbursement, but I don't think it makes a difference. Aren't you, in essence, arguing that this is a duty to defend policy? Not at all. We admit it is a duty for reimbursement, but coverage C has no limit of liability. They could have easily put a separate limit of liability into the limitation section, which they did not. They could have added language such as our obligation to pay for defense ends upon payment of our liability limits as they did in the Great American case. They don't have any such language here. Based upon the plain reading of this contract, defense costs are paid until the obligation to reimburse defense costs ends, and that's when the cases end. Any further questions? Your appeal, though, is from the fact that you failed to give notice. Your time is up. If you want to take, we'll give you two minutes to tell us why you think you succeed on that. Well, that ties into the fact that you have a repudiation. When the underwriter — The court found that you didn't have a repudiation. You had a claim, basically, that the disclaimer of coverage, which are two different things. That's the problem you have. You have a court determination that what happened here was a disclaimer. I understand that, Your Honor, but a disclaimer of repudiation is defined when you have absolute rejection of payment by the insurer without an explanation on policy terms. This policy has no limit of liability for defense costs. Therefore, they should have paid at least the amount of the judgment, which came after the exhaustion of the $5 million policy limits, which is the $3.5 million. They continue to say, regardless of the affirmative defense of failure to obtain consent, they even fail to pay those amounts with which they gave consent. And that's the $3.5 million judgment. So I believe, based upon this record, based upon the case law, there has been a repudiation of our claim for defense costs. Doesn't a repudiation ordinarily entail language that refers to terms outside of a policy? Here, they refer to the terms of the policy. Here, they refer to the lack of notice by reference to the policy that you now argue is being repudiated. I would agree with you if they paid the $3.5 million and they solely based their defense on the consent provision, but they didn't do that. They're denying coverage completely. Every disclaimer could also fall under the category of a repudiation of a policy. Not at all. If, for example, an underwriter advises the insured, you provided us with insufficient proof of a covered claim, that is not a repudiation of the coverage. That is a failure of the insured to provide sufficient information for the insurer to make a coverage determination. But if they put a time limit on it and said, you know, you were required to provide us this within 10 days and you didn't, that would be a disclaimer of obligation to cover, but which you would treat as a repudiation. No, I would not treat that as a repudiation if that was the first notice of declination. All right. We understand your argument, and I know you want to reserve time for rebuttal, so let's hear from your adversary. Thank you very much. Thank you, Your Honor. May it please the Court, my name is John Woods. I represent the Water Quality Insurance Syndicate, also known as WQIS, who are the defendants, appellees, and cross-appellants in this matter. Let me cover one important point on the repudiation point first to continue that thought. This is not a case of a claim by an assured against an insurer, although its style of American commercial barge lines against water quality, it's really a fight between excess insurers and primary insurers. The assured in this case, ACL, has had its claim paid in full. It has been fully reimbursed, and there is no liability, there is no recovery that would come from WQIS that would go to ACL, and that's confirmed in the brief by the appellants in this case. They have— How does that relate to repudiation? Well, it's a question of did the—the question of repudiation is did the insurer, WQIS, repudiate a claim under the policy to its assured? Those are what all the cases talk about. Is there repudiation because some activity outside the policy, as you point out, led to a repudiation of the insurer's obligation to pay anything under the policy? In this case, not only was— You know, this is confusing. The issue—you were obliged to pay your insured. Your insured got paid by the third party when the third party didn't think it had to, and so if you were wrong in your insurance assessment, you've got to pay the money, but the insured doesn't get paid twice, so it has to give the money back to its insured. I mean, I don't think this point helps you at all. You have a lot of ground to cover. Why don't you get to it? Okay. The—with respect to the case that we're appealing, which is whether or not we have to continue to pay defense costs after our policy limit is exhausted, the district court below in their decision recognized the cardinal principle in the interpretation of marine insurance contracts under New York law, which is that the contract should be interpreted in a manner to give effect to the intent of the parties. That is a cardinal principle. But then the court proceeded to ignore the intent of the parties. It ignored the evidence in the record of the intent of the parties, and instead it attached a literal meaning, uninformed by even the context in which the policy was issued or the context of the entire policy. Do you think the literal—the plain language of the contract does support the district court's ruling? I don't think the plain language does support it for the simple reason that— Why don't you start with that? That's where we would start in interpreting this contract. Because the plain language is liabilities covered. That's the touchstone to what is a defense cost payable by water quality. It's unarguable that that coverage does not have a dollar amount limit, but it is limited by the language of covered liabilities. And if there is—in the interpretation of the policy, that that means that WQIS pays defense costs only with respect to defending liabilities under its policy, that is within the $5 million, is an interpretation that has been accepted by the marine insurance industry for 38 years. This is the first time any excess insurer has ever sought to recover reimbursement for all of its defense costs. The district court relied on the language in the limitations paragraph in addition to the limits of liability. Well— Would that not mean that the $5 million cap doesn't apply to defense costs? As I said, and it is undisputed, that there's a $5 million limit of liability for cleanup costs, damages, and other liability of the assured. And in addition, there's defense costs to defend those covered liabilities, that is, that $5 million. And what has always happened in the past in these cases where excess insurers are— deal with the district court's conclusion that the language in addition to the limits of liability stated in above plainly says that there's no limit. It's above the $5 million. And if the insurer had intended a limit, they could have put one in. Well, again, the coverage for defense costs is in addition. And that's why in this case, WQIS paid the first $5 million, and then when defense costs were presented to it, it paid an additional $551,000. That's not the language, the wording, the plain words. Well, the only thing I can say is, again, I think the— No reference to custom. The district court—well, custom and practice. What's happened is— No reference to custom. Tell us about this language. Well, first of all, I don't think that you can look at that language without considering custom, and here's why. International Multifoods, which is widely reported and widely quoted as the seminal case, International Multifoods says— Can we start by looking at the words? No, and here's why. Words taken in isolation, just the plain meaning interpretation of the words, is not the correct way to interpret any insurance contract. And that's the holding of International Multifoods, of SR International v. World Trade Center, a whole line of cases in this court which says the threshold question is first to determine, is there any ambiguity? And in order to do that, there must be an analysis of whether the two interpretations, in fact, suggest meanings which, when viewed objectively by a reasonably intelligent person who has examined the entire integrated agreement and who is aware of the custom and usage and terminology of the relevant trade, that's the analysis that goes into the threshold determination of whether or not there's an ambiguity, not the plain meaning. You would have argued to us, especially if you heard some of the questions we were asking your adversary, that the language is plain, that coverage aid identifies the liabilities, but subpart 2 says that the limit of liability is $5 million, so the liabilities covered by coverage aid are those subject to the limits of part 2 article 8. Is that not the construction you're urging? Of course. That's exactly what we're arguing. Both sides are arguing that the wording is plain and unambiguous. And we believe that it is unambiguous. Mr. Chin's question, can you just point us to how we can read the language, the in addition to language, in a way that favors your position? Well, the in addition to language is with respect to liabilities under the policy, covered liabilities. That's how it has to be read. That's the limitation. Because there is no dollar limit. Give us a concrete example. You pay $5 million, but the investigative costs and the defense costs up to that point have been another million. You've got to pay $6 million, right? That's correct, Your Honor. That's correct. And that's what we did in this case. It wasn't an extra million. It was an extra $551,000. That's what we did. The policy worked and the excess policies worked the way they were supposed to in this case. When the spill occurred. Do the excess policies have the same terms, coverage? Their defense costs, as pointed out by Judge Rajvi, their defense costs are included within their limit. So they have a $25 million limit, then above that a $75 million limit. Defense costs are included within that. Only the primary had this appendix, as it were, sticking outside, which covered some additional defense costs. And that was a historic reason in the old days that these mom and pop operations that were getting this insurance wanted to make sure they had the full limit of liability available to them and that it wasn't eroded by defense costs. So that's why in the old days it was the scheme that was devised to allow the defense costs to be paid outside the limit. But that's only with respect to the primary. The excesses include that coverage. If it is the custom and practice of the industry, why are all these insurance companies taking this position in this case, then? Well, what insurance companies? The only insurance companies taking the position are the ones represented. The excess. Yeah, but they have one policy. I mean, there are multiple insurers, but they all insure one policy, and that's the $75 million excess of $25 million. That's the policy that's seeking to recover the defense costs that it paid willingly, knowingly, and according to the custom and practice of the industry prior to this lawsuit. I would just mention that it was mentioned in an argument by the appellant, the Great American case. I would just point out that although it's not a reported decision, there's a Westlaw site on that. The Great American case had language that was different from the language in our policy. That had a language that said it would pay defense costs in full. It did not say it would pay defense costs only related to covered liabilities or liabilities covered as ours does. Plus, in that case, as you can tell from the description of the loss, that was a one-loss event, and the defense costs were all incurred with respect to defending one loss, not whereas here, defense costs have been going on for years. And I'll just conclude on this point. The illogical result of the decision below is that eight years after the spill, eight and a half years after the spill, WQIS is still being asked to pay defense costs, and which are still being incurred. Only a few months ago, the excess insurers settled a case with the government for $20 million, but preserved the right to appeal and have appealed to the Fifth Circuit. Defense costs are continuing to be incurred, which benefit only the excess underwriter. And that was not what was intended. That was not the results anyone intended. What was intended was what happened here. The primary pays. It turns over the cleanup to the excess. It pays only the defense costs that were incurred to defend its limit, and then the excess pays the defense costs to defend its own policies. And that is the only way that consent and the going back to repudiation, the consent makes sense as well. It makes no sense for WQIS to be given the right to consent or not consent to defense costs, which are incurred to defend the $75 million excess of $25 million layer. The decision maker who's deciding what defense costs should be paid or borne by the assured and that we will take on ourselves as insurers must be the decision maker whose policy is at risk. And in this case, the defense costs are being incurred by excess, thinking they're going to push those costs down onto the primary. Never been argued before, but that's what they're going to try to do, and that's what Judge Kaplan in his decision has permitted. But they're incurring defense costs that are only protecting their policy. And it's an illogical result. It's an absurd result. And it's one that, frankly, doesn't bear scrutiny. And this court should let the losses stay where they have fallen, which is the defense costs incurred by defense by the excess to defend its own policy, should rest with them. Thank you. Because this issue was raised during my opponent's argument, I can advise the court since I'm involved with the appeal. The appeal could recover all of the money paid by all of the underwriters with the small exception of maybe $2 million. So if we do, if we are successful on that appeal, WQAS will be receiving back part of its indemnity payment based upon the numbers that have been presented to the court in the Fifth Circuit, will be presented. How do you respond to the absurdity argument? It's not absurd, Your Honor. If you understand, again, I guess I go back too far. When I started defending asbestos cases back in the late 70s and early 80s, every MGL policy had unlimited defense costs. The way the insurance industry protected itself was by adding the language that our duty to defend or our obligation to reimburse defense costs ends upon our payment of our liability limit either by way of judgment or settlement. Does it make sense that the excess carriers would want WQIS to be controlling the investigation when it's the excess carrier's money at stake? Actually, it's really the assured ACL that controls the defense. That's who really controls it. The excess do not. It has to have consent from WQIS. And had WQIS not repudiated their payments, they would have been asked. My question is it doesn't make sense to me that WQIS, once it reaches its limit of $5 million, should be controlling to some extent the investigation and defense. When it's the other insurance companies that are on the hook. This is a unique situation where we have excess insurance. Not every insured can afford to buy the excess insurance ACL did. And many of these insureds only have the WQIS limit of $5 or $10 million for pollution. These cases go on for years. They need to be protected. That's why the attractiveness of the WQIS policy was that it paid defense costs beyond its limits. That's what it says. Addressing Your Honor's question during my original argument, you asked me about the language. Under coverage C, it does say cost and expenses incurred by the assured with the prior consent of WQIS for investigation of, or defense against, any liabilities covered under sections A and B. Any liability covered. That's correct. Actually, it says any liabilities covered under coverages A and B. The liabilities are covered. Now, whether or not an underwriting. That's the limit of liability under section 2. You have coverage up to $5 million. That does not say that plainly in this policy. But your problem is you have that decision as a matter of law. If it doesn't say it plainly, it may have to be reconsidered. It's not ambiguity at all, Your Honor, because this underwriter, WQIS, which really is a group of 13 underwriters, could easily put in the protective language by putting a separate limit of liability into the policy. All right, thank you. I think we understand the argument. We're going to have to take the case under advisement. Can I direct the Court's attention to one case? I don't have the site, but it's St. Paul v. Royal Insurance, 1991. It's not cited in your brief. I don't believe it is. You don't have the site? I can provide it. Thank you. You can do that. Thank you. Thank you.